UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

United States of America,                                 Criminal No. 05-244  (JRT/SRN)

      Plaintiff,

      v.                                           **REPORT AND RECOMMENDATION**

**(1) Brodie Wayne Loeffler,**
**(2) Matthew Lloyd Sjothun,**
**(3) Derek James Tanberg,**

      **Defendants**.

---

Thomas M. Hollenhorst, Esq., Assistant U.S. Attorney, on behalf of Plaintiff

Gary R. Bryant-Wolf, Esq., on behalf of Defendant Brodie Wayne Loeffler

Jerry Strauss, Esq., on behalf of Defendant Matthew Lloyd Sjothun

Barry Vaughan Voss, Esq., on behalf of Defendant Derek James Tanberg

---

SUSAN RICHARD NELSON, United States Magistrate Judge

      The above entitled matter came before the undersigned United States Magistrate Judge on Defendants Brodie Wayne Loeffler's ("Defendant Loeffler"), Matthew Lloyd Sjothun's ("Defendant Sjothun"), and Derek James Tanberg's ("Defendant Tanberg") Motions to Suppress Evidence Obtained as a Result of Search Warrant (Doc. Nos. 66, 39, and 51) and Defendant Loeffler's Motion to Suppress Statements (Doc. No. 67). This matter is set to be tried before the Honorable John R. Tunheim, United States District Court Judge for the District of Minnesota, on October 4, 2005. This case has been referred

1

to the undersigned for resolution of pretrial matters pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons set forth below, this Court recommends that Defendants' motions to suppress evidence and Defendant Loeffler's motion to suppress statements be denied.

## I. PROCEDURAL HISTORY

On July 26, 2005, a ten-count indictment was filed charging Defendants with the following: Count 1 - conspiracy to manufacture, distribute and to possess with the intent to distribute marijuana as to all Defendants; Count 2 - distribution of marijuana as to Defendant Loeffler; Count 3 - distribution of marijuana as to Defendant Loeffler; Count 4 - distribution of marijuana as to Defendants Loeffler and Sjothun; Count 5 - manufacturing marijuana as to Defendant Sjothun; Count 6 - possession with intent to distribute marijuana as to Defendant Sjothun; Count 7 - possession with intent to distribute marijuana as to Defendant Sjothun; Count 8 - manufacturing marijuana as to Defendant Tanberg; Count 9 - possession with intent to distribute marijuana as to Defendant Tanberg; and Count 10 - possession with intent to distribute marijuana as to Defendant Loeffler (Doc. No. 21). The Government also made forfeiture allegations against Defendants pursuant to Title 21 U.S.C. § 853. Id.

At the criminal motions hearing, Defendants were present and represented by counsel. There was no testimony at the hearing but several exhibits were received into evidence. (See Exhibit List, Doc. No. 76).

## II. FINDINGS OF FACT

**The Search Warrants**

On April 28, 2005, Deputy Erik D. Fleck submitted an application and supporting affidavit for search warrants for the following seven locations: (1) property on Queens Avenue in Minneapolis for

documents (See Ex. 1); (2) property on Candy Cove in Prior Lake for controlled substances (See Ex. 3); (3) property on 61st Ave. in Plymouth for controlled substances (See Ex. 4); (4) property on Manor Rd. in Eden Prairie for documents (See Ex. 5); (5) person of Defendant Sjothun (See Ex. 7); (6) 1994 Dodge Truck (See Ex. 9); and (7) 2003 Cadillac Escalade (See Ex. 10). Deputy Fleck, has been a deputy sheriff with the Hennepin County Sheriff's office since 1999, and was assigned exclusively to the narcotics investigation unit at the relevant time. (See Ex. 1). He has worked with experienced narcotics officers and has been involved in the execution of search warrants, with surveillance, and with arrests for narcotics law violations. (Id.). The supporting affidavits to each of the search warrant applications were the same and stated the facts related to the investigation at issue in this case.

Deputy Fleck stated in his affidavit that he, along with other members of the Hennepin County Sheriff's Office and members of other law enforcement agencies, had been involved in a long-term investigation of a marijuana distribution conspiracy in which Defendants Loeffler, Sjothun, and Tanberg, along with a Justin Chloupek were considered highly involved. Deputy Fleck learned through the Minnesota Department of Motor Vehicles that Defendant Loeffler listed an address on Portland Avenue in Minneapolis, Defendant Sjothun listed his address on Candy Cove in Prior Lake, Defendant Tanberg listed his address on Queen Avenue South in Minneapolis, and Mr. Chloupek listed his address in Moorhead, Minnesota. Deputy Fleck also learned that Mr. Chloupek owned a property on 61st Avenue in Plymouth, as well as a property on Manor Road North in Eden Prairie, along with the Candy Cove property in Prior Lake which Defendant Sjothun listed as his residence. Tax records showed Mr. Chloupek purchased all three residences within a three-month period in 2004 for a total of approximately 1.1 million dollars.

On November 24, 2004, Deputy Fleck saw Defendant Loeffler driving a green truck registered to Mr. Chloupek. Surveillance observed that truck parked in the driveway of the property on 61st Avenue in Plymouth. Defendant Loeffler was observed coming out of the residence with a duffle bag which he placed in the truck and then delivered to Defendant Tanberg at his Queen Avenue South property in Minneapolis.

Soon after, Deputy Fleck spoke to a confidential reliable informant ("CRI") that has direct knowledge of the marijuana ring under investigation and was informed that Defendant Loeffler had been bragging about conducting a ten-pound marijuana delivery. This CRI had been involved in the arrest and conviction of several individuals for narcotic related offenses. Information from this CRI has lead to the seizure of large quantities of illegal narcotics and has been independently corroborated and verified.

In an undercover capacity, Deputy Fleck made three marijuana purchases from Defendant Loeffler in March 2005. On March 3, 2005, Defendant Loeffler informed Deputy Fleck that he needed to pick up the marijuana during lunch. Surveillance followed Defendant Loeffler driving a Dodge truck from his work to the 61st Avenue property in Plymouth. The truck was parked a short time in the driveway and afterwards, Defendant Loeffler drove the truck back to his work. Surveillance watched Defendant Loeffler meet Deputy Fleck in the parking lot after work at which time Deputy Fleck purchased one pound of marijuana from Defendant Loeffler. On March 10, 2005, Deputy Fleck made arrangements to purchase five pounds of marijuana from Defendant Loeffler. Defendant Loeffler again told Deputy Fleck he had to pick up the marijuana over lunch. Surveillance observed Defendant Loeffler drive the same Dodge truck to the 61st Avenue property in Plymouth. After a short time, Loeffler returned to work and was observed giving the five pounds of marijuana to Deputy Fleck after work in exchange for money.

On March 23, 2005, Deputy Fleck ordered five pounds of marijuana from Defendant Loeffler at work. Defendant Loeffler explained that he was expecting the marijuana to be delivered to his car before the end of his shift, but that his "guy" needed to pick up more marijuana at another location for the order. Prior to the order, surveillance had been established at Defendant Loeffler's work and the property at 61st Avenue in Plymouth. A 2003 Cadillac Escalade, that Defendant Sjothun had been seen driving earlier, was parked in the driveway. Surveillance observed Defendant Sjothun leave the 61st Avenue property and drive to the Candy Cove property in Prior Lake. Defendant Sjothun then drove directly to Defendant Loeffler's work. Defendant Sjothun was seen exiting the car carrying a large black duffel bag which he placed into Defendant Loeffler's Dodge truck. Defendant Sjothun then returned to the 61st Avenue property. Surveillance then observed Defendant Loeffler exit work and give Deputy Fleck eight pounds of marijuana in a large black duffel bag he had taken from his truck in exchange for money.

Deputy Fleck then began negotiating a large-scale marijuana transaction with Defendant Loeffler. On April 25, 2005, Defendant Loeffler contacted Deputy Fleck to discuss a 50-pound marijuana transaction. Defendant Loeffler explained that his "guys" were not in town yet and he would need one more day to get the marijuana. On that same day, Defendant Sjothun was observed standing in the driveway of the Manor Road property in Eden Prairie. The garage door was open and empty of vehicles. Defendant Sjothun's 2003 Escalade was parked in the driveway. On April 26, 2005, Deputy Fleck was informed that Defendant Sjothun's car was again parked in the driveway of the Manor Road property in Eden Prairie. He later confirmed that the car was there along with a vehicle registered to Defendant Tanberg.

Deputy Fleck also stated in his affidavit that he was aware through his training and experience that

5

narcotics transactions usually involve cash and a need to conceal money earned. Such organizations often purchase multiple houses, businesses and real estate properties to aid in hiding their money. Those properties are also used for storing documents, finances, narcotics, and other evidence showing where such items may be located. Notes are often seized which list the prices of drugs with reference to price per unit of measurement. Comparing this information to bank deposits or other financial transactions and other documents often reveals the amount of money earned by a drug dealer. In addition, client lists with names and phone numbers are often kept, along with video tapes of illicit activity. Furthermore, drug dealers often store names, phone numbers, and similar information in the memories of cellular telephones, pagers, or computers. Based on all this information Deputy Fleck stated that there was probable cause to believe that illegal drugs and illicit documents and drug related proceeds would be found in or on each the locations listed on the respective search warrants at issue. (See Exs. 1, 3, 4, 5, 7, 9, 10). On May 5, 2005, the search warrants were executed on the property on Queens Avenue in Minneapolis for documents (See Ex. 1), the property on Candy Cove in Prior Lake for controlled substances (See Ex. 3), the property on 61st Avenue in Plymouth for controlled substances (See Ex. 4), the property on Manor Rd. in Eden Prairie for documents (See Ex. 5), the person of Defendant Sjothun (See Ex. 7), the 1994 Dodge Truck (See Ex. 9), and the 2003 Cadillac Escalade (See Ex. 10). Evidence of illicit activity was found at each of the properties.

Also on May 5, 2005, Deputy Fleck submitted an application and supporting affidavit for a search warrant on the Queen Avenue property in Minneapolis for controlled substances. (See Ex. 2). The supporting affidavit stated the same initial facts as the supporting affidavits for the earlier search warrants. In addition, the affidavit stated that on May 5, 2005, members of the Hennepin County Sheriff's Office

Narcotics Unit, along with members from the Minneapolis Police Department's Narcotics Unit, conducted the document search warrant at the Queens Avenue property in Minneapolis. While searching for documents, officers located marijuana. At that time, the officers stopped searching, and submitted the controlled substance search warrant for the Queens Avenue property in Minneapolis. (See Ex. 2).

On May 11, 2005, Deputy Fleck also submitted search warrant applications and supporting affidavits for Defendant Loeffler's Portland Avenue apartment and Defendant Loeffler's person. (See Exs. 6 and 8). The affidavits for each application contained the same facts as the previous supporting affidavits. The search warrant was executed on May 18, 2005 and evidence of illegal activity was found.

Also on May 11, 2005, Deputy Fleck submitted search warrant applications and supporting affidavits for cellular phones, a computer, and a floppy disk. The supporting affidavits indicated that the previous searches had resulted in the seizure of theses items. The phones had been seized at the 61st Avenue property in Plymouth where a large-scale marijuana growing operation was discovered and seized, including 190 marijuana plants, large lights, ballasts, filters, other grow equipment, scales, harvested marijuana, and a loaded .45caliber handgun. (See Ex. 11). The computer had been seized at the Manor Road property in Eden Prairie, where a large-scale marijuana growing operation was about to be started and large lights, ballasts, filters, other grow equipment, an electronic money counter, and a gun case were all seized. (See Ex. 12). Deputy Fleck stated that in his experience and training narcotics distributors often keep detailed records of the narcotics transactions in a variety of ways, including the use of cellular phones, computer hard-drives, and other devices capable of electronically storing information. Deputy Fleck contended, based on this information, that there was probable cause to believe that such records and evidence of illegal activities would be present within the cellular phones and the computer hard-drive or

disk, and requested search warrants to examine those items.

Most of the applications for the search warrants requested that a nighttime search be allowed. (See Exs. Nos. 1, 3, 4, 5, 6, 7, 8, 9, 10). The affidavits stated that the investigation had resulted in several search warrants, including search warrants for people, vehicles, and residences. Deputy Fleck explained that it was important that the search warrants be executed as close to the same time as possible to prevent the detection of the investigation and the destruction of evidence.

**Defendant Loeffler's Statements**

On May 18, 2005, after his arrest, Defendant Loeffler was interviewed at the Hennepin County Sheriff's Office Narcotics Unit by Deputy Joe Poidinger. Testimony about the interview was not presented during the hearing but a transcript and DVD of the interview were submitted as exhibits. (See Exs. 13 and 14).

At the start of the interview, Deputy Poidinger asked Defendant Loeffler for his name, date of birth, and address. (Ex. 13, at 1). Deputy Poidinger then read Defendant Loeffler his Miranda rights and asked Defendant if he understood his rights. (Id.). Defendant Loeffler indicated that he did and Deputy Poidinger asked him if, having these rights in mind, he would talk to the Deputy. (Id.). After the Miranda warning, Deputy Poidinger proceeded to ask Defendant Loeffler questions relating to the investigation. Defendant Loeffler made numerous statements in response to the questions. Defendant Loeffler never asked to terminate the interview or to have legal counsel present. There were no threats or promises made during the interview. Defendant Loeffler was cooperative and appeared to understand the questions asked of him and provide responsive answers to them. At one point Defendant Loeffler stated he needed something to drink. Deputy Poidinger arranged for a beverage and concluded the interview at that time.

### III.   PARTIES' POSITIONS

Each Defendant moves to suppress the physical evidence obtained as a result of the search and seizures pursuant to the various search warrants. Defendant Loeffler moves for an Order suppressing evidence seized from the properties at Manor Road in Eden Prairie, Queen Avenue in Minneapolis, 61st Avenue in Plymouth, Candy Cove in Prior Lake, and the Portland Avenue apartment in Minneapolis, as well as any evidence found in the Cadillac Escalade, the two cellular telephones, and the computer (Doc. No. 66). Defendant Sjothun moves to suppress all the evidence seized as a result of any of the search warrants (Doc. No. 39). Defendant Tanberg moves to suppress evidence obtained as a result of the search and seizure of his residence at the Queen Avenue property in Minneapolis (Doc. No. 51). Defendant Loeffler further moves to suppress the statements he made after his arrest (Doc. No. 67).

The Government argues that there are no grounds upon which to suppress the evidence seized pursuant to the search warrants and that the motions to suppress the evidence seized should be denied. Similarly, the Government contends that Defendant Loeffler's motion to suppress his statements, should be denied. Defendant Loeffler, the only Defendant who made any statements, was questioned and provided incriminating statements only after he received and waived his Miranda rights.

This Court concludes that there was probable cause to issue each of the search warrants and the evidence found as a result of the searches is admissible. Furthermore, this Court finds that the May 18, 2005 statements by Defendant Loeffler were voluntarily made after knowingly and voluntarily waiving his Miranda rights. As such, the statements are also admissible. Defendants' Motions to Suppress Evidence (Docs. Nos. 66, 39, and 51) and Defendant Loeffler's Motion to Suppress Statements (Doc. No. 67) should be denied.

## IV.  DISCUSSION

### A.  Motions to Suppress Evidence Obtained as a Result of Search and Seizure

The Defendants challenge the search warrants on their four corners alleging that they were issued without probable cause and in violation of the Fourth Amendment. The Court's inquiry is whether the "four corners" of the warrant affidavits supplied a substantial basis for concluding evidence of wrongdoing would be found in the places to be searched.

A search warrant protects an individual's privacy interest in his or her home and possessions against unjustified police intrusions. Steagald v. United States, 451 U.S. 204, 213 (1981). To satisfy the warrant requirement, an impartial judicial officer must assess whether the police have probable cause to make an arrest, to conduct a search, or to seize evidence, instrumentalities, fruits of a crime, or contraband. Warden v. Hayden, 387 U.S. 294, 301-02 (1967). Probable cause to search is defined as "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); see United States v. Rankin, 261 F.3d 735, 738-39 (8th Cir. 2002). There is probable cause to issue a search warrant when the affidavit supporting a search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched. United States v. Terry, 305 F.3d 818, 823-24 (8th Cir. 2002). "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978). "[C]ourts may not look to facts outside the affidavit in determining the existence of probable cause," United States v. Martin, 833 F.2d 752, 757 (8th Cir. 1987) (Lay, C.J., concurring), cert. denied, 494 U.S. 1070 (1990); rather, "'only that information which is found within the

four corners of the affidavit may be considered in determining the existence of probable cause.'" United States v. Etheridge, 165 F.3d 655, 656 (8th Cir. 1999).

Whether probable cause exists depends on the totality of the circumstances. Gates, 462 U.S. at 238; see also United States v. Gabrio, 295 F.3d 880, 882-83 (8th Cir. 2002). A court does not evaluate each piece of information independently, but rather considers all of the facts for their cumulative meaning. United States v. Allen, 297 F.3d 790, 794 (8th Cir. 2002). Because reasonable minds may differ on whether a particular search warrant affidavit establishes probable cause, "preference for warrants is most appropriately effectuated by according 'great deference' to a magistrate's determination." United States v. Leon, 468 U.S. 897, 913-14 (1984); accord Gates, 462 U.S. at 236-37. In this regard, this Court does not make a de novo review of the sufficiency of the affidavit. Gates, 462 U.S. at 236; accord United States v. Reivich, 793 F.2d 957, 959 (8th Cir. 1986) ("[A] district court should not make a de novo determination of probable cause . . . ."). Rather, "the decision to issue the warrant is to be upheld if supported by substantial evidence in the record," Reivich, 793 F.2d at 959, or, in other words, "so long as the [issuing Judge] had a 'substantial basis for . . . conclud[ing]' that a search would uncover evidence of wrongdoing." Gates, 462 U.S. at 236. Moreover, a court "may properly rely on normal inferences drawn by the surrounding circumstances and the allegations of facts contained in the affidavit." United States v. Carlson, 697 F.2d 231, 238 (8th Cir. 1983).

The Court is to "ensure that the evidence as a whole provides a substantial basis for finding probable cause to support the issuance of the search warrant." Terry, 305 U.S. at 823. Probable cause can be based on information from an independent source that can be independently corroborated. Gates, 462 U.S. at 238; Draper v. U.S., 358 U.S. 307, 313 (1959); United States v. Young, 184 F.3d 781, 783

11

(8th Cir. 1999). Probable cause may also be established by the personal observations, experiences, and training of a police officer or circumstantial evidence. United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002); United States v. Wells, 223 F.3d 835, 839 (8th Cir. 2000); United States v. Searcy, 181 F.3d 975, 981 (8th Cir. 1999). "When an affidavit is based in substantial part on information from an informant, the informant's reliability, veracity, and basis of knowledge are relevant considerations–but not independent, essential elements–in finding probable cause." Reivich, 793 F.2d at 959 (citing Gates, 462 U.S. at 230); accord, e.g., United States v. LaMorie, 100 F.3d 547, 553 (8th Cir. 1996). In the end, these considerations "should be understood simply as closely intertwined issues that may usefully illuminate the commonsense, practical question" of whether in the totality of the circumstances the issuing Judge had a substantial basis for concluding that probable cause existed. Gates, 462 U.S. at 230, 236.

This Court finds that based on the totality of the circumstances and the facts set forth in the supporting affidavits, there was a fair probability that drugs or related evidence of a crime would be found at the locations listed in the search warrant applications. Each of the affidavits were the same or substantially similar and can be analyzed jointly.

The affidavits explain that the Defendants were considered to be highly involved in a marijuana distribution conspiracy that authorities had been investigating for a while. Information was learned about the Defendants and the investigation through members of other law enforcement agencies and public records. The affidavit explained that information had been received from an independent source that Defendant Loeffler was involved in the sale of marijuana. While that alone might not have been sufficient to establish probable cause for a search warrant, the information was sufficiently corroborated by the police investigators' own observations and experiences. Surveillance had observed Defendant Loeffler's earlier

behavior to be in accordance with the CRI's information. Information received from the CRI had been independently corroborated and found to be true. Deputy Fleck then completed three different undercover purchases of marijuana from Defendant Loeffler, and arranged for a fourth larger transaction. Surveillance before and/or after each transaction observed the Defendants meeting with each other and going to and from several of the properties listed in the search warrants.

The search warrants in this case are not based on stale information. The investigation revolved around long-term and ongoing criminal activity. The affidavits in support of the search warrants were written between April 28, 2005 and May 11, 2005. Although the facts set forth in the affidavits take place from 2004 through April 26, 2005, the most incriminating activity took place within one month of the affidavits being written. The three undercover marijuana purchases took place in March 2005, and the plans for the fourth larger purchase were still ongoing just days before the affidavits were written.

Deputy Fleck, the affiant for all of the search warrants, has been a deputy sheriff since 1999 with the Hennepin County Sheriff's Office, and works specifically with the narcotics unit. He has experience with the investigation of controlled substance law violations, the execution of search warrants, surveillance, and arrests for narcotics law violations. The affidavits must be considered in light of Deputy Fleck's training and experience that drug transactions involve large amounts of cash and the need to hide this cash through the purchase of numerous properties. These properties can then be used to store documents, drugs, and other evidence of illegal activities. In addition, drug dealers often maintain names and numbers of clients in numerous locations including cellular telephones and computers.

In this case, examination of the totality of the circumstances and the facts set forth in the supporting affidavits provides a substantial basis for finding probable cause to support the issuance of the search

13

warrants. The warrants do not fail for staleness. See United States v. LaMorie, 100 F.3d 547, 554 (8th Cir. 1996) ("There is no bright-line test for determining when information is stale . . . Time factors must be examined in the context of a specific case and the nature of the crime under investigation."); see also United States v. Macklin, 902 F.2d 1320, 1326 (8th Cir. 1990) (Where it is suspected that criminal activity is ongoing, the passage of time is less significant.). In addition, the nighttime parameters of the search warrants were specifically provided for in the warrant for controlled substances and justified to protect the investigation, the officers, and the evidence. See United States v. McAtee, 2005 WL 1491214 (N.D. Iowa 2005); see also United States v. Berry, 113 F.3d 121 (8th Cir. 1997).

Finally, even if a search warrant application is later found to lack probable cause, evidence found during its execution need not be suppressed when police obtain the evidence through objective good faith reliance on a facially valid warrant. See Leon, 468 U.S. at 920; see also United States v. Rugh, 968 F.2d 750, 754 (8th Cir. 1992). "[E]ven if we thought the warrant affidavit did not establish probable cause, the good faith exception to the warrant requirement would apply because the affidavit was sufficient to allow an officer to reasonably believe probable cause existed." United States v. Johnson, 219 F3d 790, 791 (8th Cir. 2000) (citing Leon, 468 U.S. at 923).

In the instant case, there is no indication that the issuing judges abandoned their judicial role, that Deputy Fleck knew of the falsity or was reckless with regard to the truth of anything in his affidavit, that the warrant was facially deficient, or that the warrant was so lacking in probable cause as to render official belief in it unreasonable. See generally Leon, 468 U.S. at 923 (explaining when the good faith exception does not apply); see also United States v. Gibson, 928 F.2d 250, 253-54 (8th Cir. 1991) (finding that the Leon good faith exception applied on a showing of probable cause much less than that exhibited here).

As such, all of the searches at issue were legal and the evidence found as a result is admissible. The Defendants motions to suppress such evidence (Docs. Nos. 66, 39, and 51) should be denied.

### B.     Defendant Loeffler's Motion to Suppress Statements

Defendant Loeffler moves to suppress the statements he made during the May 18, 2005 interview after his arrest (Doc. No. 67). This Court finds that Defendant Loeffler's statements should not be suppressed because they were voluntarily made after he was properly informed of his Miranda rights, and knowingly and voluntarily waived them.

### 1.     Defendant Loeffler was informed of his Miranda rights on May 18, 2005, and knowingly, voluntarily, and intelligently waived them.

Before any evidence obtained as a result of a custodial interrogation may be used against a defendant at trial, the Fifth Amendment requires that a defendant in custody and subject to interrogation by law enforcement agents be advised of his constitutional rights and make a knowing, intelligent and voluntary waiver of those rights. Miranda v. Arizona, 84 U.S. 436, 444 (1966). Suspects must be informed of these Miranda rights before questioning begins. Id. at 469-70. Statements elicited from a suspect in violation of Miranda are inadmissible. Stansbury v. California, 511 U.S. 318, 322 (1994). After the warnings are given, if the suspect indicates that he wishes to assert these rights, the interrogation must stop. Miranda, 384 U.S. at 473-74.

After being informed of his Miranda rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. Id. at 444; United States v. Syslo, 303 F.3d 860, 866 (8th Cir. 2002). It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards. Miranda, 384 U.S. at 473;

15

Colorado v. Connelly, 479 U.S. 157, 168 (1986). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. While courts will not presume a waiver from a defendant's silence or subsequent confession alone, an express waiver is not necessary. North Carolina v. Butler, 441 U.S. 369, 373, 375-76 (1979) (explicit waiver not necessary to show defendant waived right to remain silent when defendant volunteered incriminating statements); United States v. Barahona, 990 F.2d 412, 418 (8th Cir. 1993)(valid waiver inferred even though defendant refused to sign waiver form because defendant clearly understood rights and was cooperative with police); United States v. Duque, 62 F.3d 1146, 1152-53 (9th Cir. 1995)(valid waiver inferred because, after having been given Miranda rights and asked if he was "of mind to speak with officers," defendant made incriminating statements).

Based on the transcript and DVD of the May 18, 2005 interview (Exs. Nos. 13 and 14), this Court finds that Defendant Loeffler made his statements during the interview after he was informed of his Miranda rights and validly waived them. Defendant Loeffler had been arrested at the time of the interview. He was interviewed alone by Deputy Poidinger. As he was in custody, he was properly read his Miranda rights at the start of the interview. The only questions asked before the reading of his rights were three non-incriminating biographical questions. After the Miranda warning was given, Defendant Loeffler was asked if he understood those rights and indicated he did. Defendant Loeffler was then asked if, having these rights in mind, he wanted to talk. Although Defendant Loeffler did not explicitly answer affirmatively, such an explicit statement is unnecessary to find that he validly waived his rights implicitly. After indicating he understood his rights, and being asked if he wanted to talk, Defendant Loeffler proceeded to answer the

questions posed to him by Deputy Poidinger. A valid waiver may be inferred because after being read his rights, Defendant Loeffler indicated he understood his rights and cooperated with the Deputy. He did not ask to stop the interview and he never requested an attorney. There is nothing in the evidence to suggest that Defendant Loeffler's waiver was made unknowingly or involuntarily. He was advised of his rights, indicated he understood his rights, and gave responsive answers, all of which in combination constitute a voluntary and knowing waiver of his rights.

### 2. Defendant Loeffler voluntarily made the May 18, 2005 statements

In addition to informing a suspect of their rights and receiving a valid waiver of those rights, a statement or confession that is involuntarily made by a suspect is violative of his or her due process rights. Haynes v. Washington, 373 U.S. 503, 513-514 (1963); United States v. Kime, 99 F.3d 870, 878-79 (8th Cir.1996). If a statement is induced by threats, promises, or by any other way in which the suspect's will is overborne, the statements are not voluntary and are inadmissible. Haynes, 373 U.S. at 513. Whether a confession is the involuntary product of coercion is judged by the totality of the circumstances, including an examination of both the conduct of the officers and the characteristics of the accused. Wilson v. Lawrence County, 260 F.3d 946 (8th Cir.2001). The question of whether a statement is voluntary focuses on: (1) the conduct of law enforcement officials in creating pressure; and (2) the suspect's capacity to resist that pressure. Mincey v. Arizona, 473 U.S. 385, 399-401 (1978) (confession involuntary when continued police interrogation of hospitalized suspect overwhelmed suspect's free will); Davis v. North Carolina, 384 U.S. 737, 752 (1966) (confession involuntary when police repeatedly interrogated jailed suspect held incommunicado over 16-days). In addition, the coercion inducing the involuntary statement must be done by a state actor. Connelly, 479 U.S. 157 (1986). Among other factors commonly considered in assessing

17

the totality of the circumstances surrounding testimonial evidence supplied by a defendant are: (1) the location of the questioning; (2) whether Miranda warnings were given; and (3) whether the accused initiated contact with law enforcement officials. Battel v. Delo, 19 F.3d 1547, 1563-64 (8th Cir. 1994) (confession voluntary when defendant with eighth-grade education given multiple oral and written Miranda warnings and waived Miranda rights, modified, 64 F.3d 347 (8th Cir. 1995)); United States v. Hatten, 68 F.3d 257, 262 (8th Cir.1995) (confession voluntary when defendant initiated exchange which led to his incriminating statements).

Based on the transcript and the DVD of the May 18, 2005 interview (Exs. Nos. 13 and 14), this Court finds that the Defendant was not coerced into making his statements. Rather, the statements were voluntarily made after properly receiving and validly waiving his Miranda rights. The interview was recorded and no promises or threats were made during the interview. There is nothing in the record to suggest that Deputy Poidinger's conduct created any undue pressure on Defendant Loeffler, that Defendant was particularly susceptible to coercion, or that his will was in any way overborne. Defendant Loeffler answered each question asked and the interview ended when he indicated he was thirsty.

Given the foregoing, Defendant Loeffler's statements from May 18, 2005, were voluntarily made after waiving his Miranda rights. The statements are admissible and his motion to suppress his statements from that day should be denied.

## V. RECOMMENDATION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Defendants' Motions to Suppress Evidence Obtained as a Result of Search and Seizure

(Doc. Nos. 66, 39, and 51) be **DENIED**; and

2. Defendant Brodie Wayne Loeffler's Motion to Suppress Statements (Doc. No. 67) be **DENIED**.

Dated: September 20, 2005                           s/Susan Richard Nelson
                                                     SUSAN RICHARD NELSON
                                                     United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before October 4, 2005, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made. Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by (same date as above), 2005 a complete transcript of the hearing. This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.